# UNITED STATES DISTRICT COURT
## for the
## DISTRICT OF ARIZONA

United States of America

v.

(1) Kevin Aguirre; and
(2) Anthony Aispuro-Rios

**CRIMINAL COMPLAINT**

Case No.: 26-7008MJ

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

On or about the dates described in Attachment A, in the County of Maricopa, in the District of Arizona, the defendants violated:

Title 18, United States Code, Section 554(a), Smuggling Goods from the United States; and Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2, Material False Statement During the Purchase of a Firearm, Aid and Abet;

Offenses described as follows:

**See Attachment A – Description of Counts 1-3**

I further state that I am a Special Agent for Homeland Security Investigations and that this complaint is based on the following facts:

**See Attachment B, Statement of Probable Cause, Incorporated by Reference Herein.**

Continued on the attached sheet and made a part hereof: ☒Yes ☐ No

REVIEWED BY AUSA ANNA LINDROOTH

ANNA LINDROOTH Digitally signed by ANNA LINDROOTH Date: 2026.10.26 12:44:07 -07'00'

HSI Special Agent Michael Honadle
Name of Complainant

MICHAEL J HONADLE Digitally signed by MICHAEL J HONADLE Date: 2026.10.26 12:34:11 -07'00'
Signature of Complainant

Sworn to and subscribed telephonically
10/26/2026 @ 4:26 p.m.
Date

at Phoenix, Arizona
City and State

HONORABLE M. BRIDGET MINDER
United States Magistrate Judge
Name & Title of Judicial Officer

Mary Bridget Minder
Signature of Judicial Officer

**ATTACHMENT A**

**DESCRIPTION OF COUNTS**

**COUNT 1**

Between on or about August 1, 2024, through October 26, 2024, in the District of Arizona, Defendants, KEVIN AGUIRRE and ANTHONY AISPURO-RIOS, knowingly and fraudulently exported and sent from the United States, and attempted to export and send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, and received, concealed, bought, sold, and in any manner facilitated the transportation, concealment, and sale of such merchandise, article or object, that is: an unknown quantity of rounds of 7.62x39mm ammunition; knowing the same to be intended for exportation contrary to any law or regulation of the United States, to wit: Title 50, United States Code, Section 4819, and Title 15, Code of Federal Regulations, Parts 736.2, 738, 742.17, and 774.

In violation of Title 18, United States Code, Section 554(a).

**COUNT 2**

On or about May 18, 2025, in the District of Arizona, Defendant, KEVIN AGUIRRE, did knowingly and intentionally aid and abet another individual, H.M., in knowingly making a false statement and representation in connection with the acquisition of a firearm to a business, S2 Armament, in Glendale, Arizona, which were intended and likely to deceive the businesses as to a fact material to the lawfulness of a sale of a firearm by the business, which was licensed under the provisions of Chapter 44 of Title 18, United States Code, in that H.M. did execute a Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473, Firearms Transaction Record, stating he was the actual buyer or transferee of the firearm, and was not buying the firearm on behalf of another person, whereas in truth and fact, H.M. knew that he was buying the firearm on behalf of Defendant, KEVIN AGUIRRE.

In violation of Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2.

**COUNT 3**

On or about December 3, 2025, in the District of Arizona, Defendant, ANTHONY AISPURO-RIOS, did knowingly and intentionally aid and abet another individual, L.Z., in knowingly making a false statement and representation in connection with the acquisition of a firearm to a business, Tombstone Tactical, in Phoenix, Arizona, which were intended and likely to deceive the businesses as to a fact material to the lawfulness of a sale of a firearm by the business, which was licensed under the provisions of Chapter 44 of Title 18, United States Code, in that L.Z. did execute a Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473, Firearms Transaction Record, stating he was the actual buyer or transferee of the firearm, and was not buying the firearm on behalf of another person, whereas in truth and fact, L.Z. knew that he was buying the firearm on behalf of Defendant, ANTHONY AISPURO-RIOS.

In violation of Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2.

## ATTACHMENT B

## STATEMENT OF PROBABLE CAUSE

I, Special Agent Michael Honadle, being first duly sworn, hereby state:

## INTRODUCTION

1. As described further below, this affidavit sets forth probable cause that the defendants, Kevin AGUIRRE and Anthony AISPURO-RIOS, violated Title 18, United States Code, Section 554(a), Smuggling Goods from the United States, and Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2, Material False Statement During the Purchase of a Firearm, Aid and Abet.

## AFFIANT BACKGROUND

2. I am a Special Agent with Homeland Security Investigations (HSI) and have been employed in that capacity since September 7, 2025. I am currently assigned to HSI Phoenix, Homeland Security Task Force. My duties include conducting investigations involving firearms trafficking, narcotics trafficking, transnational criminal activity, and other violations of federal law.

3. Since joining HSI, I successfully completed the 12-week Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. CITP provided instruction in federal criminal law, constitutional law, the Federal Rules of Criminal Procedure, and the preparation and execution of federal search and arrest warrants. I also received training in investigative techniques, including physical and electronic surveillance, witness and subject interviews, report writing, evidence handling, and the collection and preservation of digital evidence.

4. On July 24, 2026, I successfully completed HSI Special Agent Training (SAT). SAT provided agency-specific training regarding HSI's investigative authorities, policies, and operational responsibilities. The training included instruction in conducting complex criminal investigations; identifying and developing investigative leads; case planning and management; utilizing investigative databases and law-enforcement information systems; preparing investigative reports, affidavits, criminal complaints, and applications for judicial process; and collecting, documenting, handling, and preserving

physical and digital evidence. SAT also included instruction concerning investigations involving transnational criminal organizations and offenses involving firearms trafficking, narcotics smuggling, human smuggling, financial crimes, and other cross-border criminal activity.

5. While serving as an HSI Special Agent, I have participated in numerous investigations involving firearms trafficking and narcotics trafficking. Through these investigations, my training, and my experience, I have become familiar with common methods used by criminal organizations and trafficking networks to communicate, coordinate transactions, transport and conceal contraband, and facilitate illicit activity.

6. Prior to my employment with HSI, I served as a United States Border Patrol Agent (USBP). On January 15, 2019, I completed the six-month Border Patrol Agent Basic Training Program at FLETC in Artesia, New Mexico. Following graduation, I was assigned to the Wellton Border Patrol Station in the Yuma Sector.

7. While assigned to the Wellton Border Patrol Station, I served as a member of the Wellton Station Anti-Smuggling Unit, Field Intelligence Team (WEL ASU-FIT). In that capacity, I investigated illicit smuggling organizations operating in the United States, including organizations involved in the smuggling of noncitizens, narcotics, and other contraband.

8. During my tenure with USBP, I participated in numerous investigations involving alien-smuggling and narcotics-smuggling organizations, including investigations with ties to transnational criminal organizations. My duties included reviewing and analyzing criminal-history and law-enforcement records; conducting interviews of subjects, witnesses, and other relevant individuals; coordinating investigative activities with partner law-enforcement agencies; and disseminating investigative information through appropriate law-enforcement channels.

9. Through my training and investigative experience, I became familiar with methods used by criminal organizations to transport and conceal contraband, including

firearms. This experience included identifying the use of vehicles and other means to facilitate trafficking and smuggling activity.

10. At the conclusion of my assignment to WEL ASU-FIT, I was promoted to Supervisory Border Patrol Agent. While employed with USBP, I earned an Associate of Science degree in Criminal Justice from Erie Community College.

11. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, or witnesses. This affidavit is intended merely to show that there is sufficient probable cause for issuance of the complaint and does not set forth all of my knowledge about this matter. Statements recited are set forth in substance and in part unless otherwise indicated.

**Background on Firearms Purchasing**

12. The following is known to your Affiant from speaking with Bureau of Alcohol, Tobacco and Firearms (ATF) Special Agents.

13. When a person purchases a firearm from a federal firearms licensee (FFL), that person must fill out an ATF Form 4473. This form is the official transfer record that documents the transfer of the purchased firearm(s) from the FFL to the purchaser. When a purchaser fills out the form, the purchaser must provide personal information and answer a series of questions that are designed to determine if the purchaser is buying the firearms for himself and if the purchaser is a prohibited possessor. The dealer fills out portions of the form as well, to include the make, model, and serial number of the firearm(s) being transferred. If a purchaser buys two or more pistols or rifles (in designated border states) in five days, the FFL must send a notice of a multiple sale to ATF. On this notice, the FFL must provide ATF with the name, date of birth, address, other personal identifiers of the purchaser, and the firearms purchased by the buyer. ATF Special Agents have access to a database where multiple sale information is stored. ATF Special Agents often share these reports with HSI Special Agents to assist in HSI firearms investigations.

14. Section A of ATF Form 4473 asks for the purchaser's name, date of birth, current address, and other personal identifiers. The purchaser must also answer a series of

questions designed to determine if that person is a prohibited possessor. Section A also contains a certification that states, “I certify that my answers are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering “yes” to question 21.a. (previously 11.a.) if I am not the actual transferee/buyer is a crime punishable as a felony under Federal Law and may also violate State and/or local law. …I also understand that making any false oral or written statements or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal Law and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a federal firearms license is a violation of Federal law.…” Below this paragraph, the purchaser must sign and date.

**Initiation of Investigation into Kevin AGUIRRE**

15. On July 8, 2024, the Peoria Police Department opened case number 2024-00047717 after a reporting party contacted police about Instagram content posted by an account using the handle “_LMPexotics.”

16. The reporting party stated that he had previously met the “_LMPexotics” account user at a car meet, followed the account on Instagram, and exchanged messages with the account user. The reporting party described the account user as a Hispanic male in his early twenties who drove a gray Dodge Charger Hellcat.

17. The reporting party stated that the Instagram account displayed content appearing to depict several people with firearms and gunfire in a driveway. The reporting party did not know where the activity occurred. The reporting party also did not identify the account user by name in the initial report.

18. On August 30, 2024, a Peoria Police Department supplement listed Kevin AGUIRRE, an adult male, as an investigative lead. The supplement identified AGUIRRE’s primary telephone number as +1 602XXXXX21 and associated him with a gray 2023 Dodge Charger bearing an Arizona license plate.

19. On February 4, 2026, the HSTF National Coordination Center (HSTF NCC) issued an official lead to HSI Phoenix regarding AGUIRRE. The lead identified AGUIRRE as associated with Instagram account "_Impexotics," Instagram User Identification Number 2564019444, telephone number +1 602XXXXX21, and an email address associated with AGUIRRE.

20. The HSTF NCC lead identified "Richy Rich" and "Money Kace" as aliases associated with AGUIRRE. The lead also identified additional accounts believed to be associated with AGUIRRE, including accounts using "Imp.kace," "_Impexotics2," "Impexotics," "k_0_5_g," and "LMPexotics."

21. The HSTF NCC lead identified telephone number +1 602XXXXX21 and email address kev.aguirreXXXX@XXXX.com as associated with the "_Impexotics" account.

22. The HSTF NCC lead summarized information from Instagram's parent company META concerning the "_Impexotics" account. The lead described chats and social-media activity involving firearms, firearms shows, acquiring firearms through other persons, seeking people with clean backgrounds, and purchasing firearms from retail stores. Your Affiant recognizes this activity to be consistent with activity conducted by firearm traffickers.

23. Among the communications summarized in the lead were messages stating: "Who can get 5-10 G[lock] 19Xs weekly, paper ready"; "Best bet is getting it from the store, bro. Pay someone to get it out for you"; and "$300 in 30 mins. LMK. No driving or anything, quick money. Just gotta be 21+ with a clean background."

24. Based on your Affiant's training and experience, your Affiant recognizes these statements as consistent with efforts to recruit individuals to serve as straw purchasers in furtherance of firearms-trafficking activity.

25. The HSTF NCC lead also described messages concerning "Dracos," firearms shows, and transportation activity. "Dracos" are known to your Affiant as AK-47 style, semi-automatic pistols. Through your Affiant's training and experience, your Affiant

knows that Dracos and AK-47 style rifles are highly trafficked to Mexico based on their desirability to Mexican cartel organizations.

26. The lead described media associated with the account as including firearms, quantities of firearms, and messages seeking individuals to obtain firearms from stores. Examples of the photographs received in the HSTF NCC lead from AGUIRRE's Instagram account are included below:

27. 

28. 

29. 

30. 

31. 

32. 

33. 

34. 
Brand new Never shot
(7.62X51/308)

35. 
Who can get me some from the store?
1k 💰

36. 


37. 


38. Your Affiant reviewed subpoenaed phone tolls showing contacts between telephone number +1 602XXXXX21, attributed to AGUIRRE, and telephone number +1 602XXXXX07, which investigators attributed through phone tolls, public records, and

Customs and Border Protection records, to an adult male identified as Anthony AISPURO-Rios ("AISPURO.")[1]

39. On January 10, 2026, phone tolls showed AGUIRRE and AISPURO spoke by telephone at approximately 5:39 p.m. for 265 seconds. On the same date, AGUIRRE used the "_Impexotics" Instagram account to communicate with another individual concerning firearms trafficking.

40. On January 11, 2026, at approximately 5:41 p.m., an individual communicated with AGUIRRE through Instagram and asked, "You have anyone bro? Or are you the one that's down to go to the store[.]" Based on the communications reviewed by your Affiant and the other information developed during this investigation, the message was consistent with asking AGUIRRE whether he had an individual available to purchase firearms from a retail store. At approximately 7:37 p.m. that same evening, AGUIRRE and AISPURO spoke by telephone for approximately 24 seconds.

41. The timing of AGUIRRE's communications with AISPURO, in relation to AGUIRRE's firearms-related Instagram communications, was consistent with coordination between AGUIRRE and AISPURO concerning firearms-acquisition activity.

**<u>October 2024 Ammunition-Smuggling Event – AISPURO and AGUIRRE</u>**

42. On or about October 27, 2024, U.S. Customs and Border Protection (CBP) officers encountered an adult male, known to your Affiant and identified herein as I.R., at the Calexico West Port of Entry (POE) while he was operating a rented 2021 Nissan vehicle northbound from Mexico into the United States.

43. During the inspection, CBP officers found five packages containing a total of 636 rounds of 7.62-millimeter ammunition concealed within the vehicle's quarter

[1] ATF special agents later interviewed AISPURO over the phone using telephone number +1 602XXXXX07 and confirmed his identity.

panels. CBP seized the ammunition, the vehicle, and I.R's cellular telephone. Photographs below were taken during the inspection of the vehicle:

44. 


45. 



46.



47.

48. 
ADOT
Motor Vehicle Division
ARIZONA VEHICLE REGISTRATION
CARRY IN VEHICLE AT ALL TIMES
3N1CN8EV1ML835604
48944486
76A9PX
2021
Regular
09/30/2025
000000
09/26/2024 07:09
NISS
FEES
SCOTTSDALE DISCOUNT AUTO LLC
1620 N 87TH ST
SCOTTSDALE AZ 85257-2923

49. 
76A 9PX

50. 

51. I.R. was detained for further investigation. After being advised of his rights under *Miranda*, I.R. stated that a person he knew as "Richy" recruited him to transport ammunition from Phoenix, Arizona, into the Republic of Mexico, after they met at a party in May 2024. The male stated that "Richy" asked him to rent the vehicle and meet him at a Costco in the Phoenix, Arizona area.

52. I.R. stated that, after meeting "Richy" at the Costco, "Richy" took possession of the rented vehicle for approximately one hour and then returned it to I.R. I.R. stated that he subsequently drove the vehicle into Mexico.

53. I.R. stated that, after entering Mexico, he received instructions by phone to leave the vehicle at a designated location. I.R. stated that an unidentified female took possession of the vehicle and returned it to him approximately one hour later.

54. Border-crossing records showed that the involved vehicle crossed southbound from the United States into Mexico on October 26, 2024, and crossed northbound from Mexico into the United States on October 27, 2024. CBP discovered the concealed ammunition during the October 27, 2024, northbound inspection.

55. During his interview, I.R. advised this was his second time smuggling ammunition into Mexico for "Richy," and the first was just over a month prior. I.R. stated

each time he was paid $1,500 to smuggle ammunition. Law enforcement database checks confirmed an inbound crossing for I.R. on August 13, 2024.

56. Investigators concluded the unknown individual(s) in Mexico failed to remove all of the concealed ammunition before I.R. attempted to return into the United States on October 27, 2024.

57. A forensic examination of I.R.'s cellular telephone identified telephone number +1 602XXXXX21 in I.R.'s contacts under the name "Richy Rich." This is the phone number associated with AGUIRRE.

58. On September 8, 2026, HSI and partner agencies arrested I.R. after a federal grand jury issued an indictment charging I.R. with conspiracy to smuggle goods from the United States under 18 U.S.C. § 371.

59. Your Affiant, as well as HSI Special Agent Matthew Gunty, and ATF Special Agent Trevor Page interviewed I.R. after his arrest. Your Affiant advised I.R. of his *Miranda* rights. I.R. agreed to answer certain questions, and the interview was audio recorded.

60. During the interview, your Affiant showed I.R. a photograph of AGUIRRE. I.R. identified AGUIRRE as the person he knew as "Kevin" and "Richy Rich."

61. I.R. stated AGUIRRE directed him to rent a vehicle, loaded ammunition into the vehicle, and instructed I.R. to drive the vehicle into Mexico.

62. I.R. again stated that he smuggled ammunition for AGUIRRE on two occasions, including the October 27, 2024, event that resulted in the Calexico West POE seizure described above.

63. I.R. stated AGUIRRE was going to pay him cash for transporting ammunition. I.R. further stated AGUIRRE asked him to acquire firearms and firearm magazines for transport into Mexico.

64. I.R. specifically stated that AGUIRRE asked him to acquire a .50-caliber rifle, a SCAR rifle, an FN Minimi, and 50 firearm magazines for transportation into Mexico.

65. I.R. stated that, after one ammunition-smuggling event, he and AGUIRRE traveled to a Phoenix residence and provided your Affiant with the address. Your Affiant learned through public records this residence is associated with AISPURO.

66. I.R. stated that AISPURO was pleased that ammunition had successfully been transported into Mexico. I.R. further stated that AISPURO and AGUIRRE discussed obtaining a .50-caliber rifle and transporting it into Mexico.

67. I.R. also stated that, after the first occasion in which he smuggled ammunition for AGUIRRE, AGUIRRE collected approximately $10,000 at a residence in Phoenix, Arizona. I.R. was unable to provide the exact address of the residence where AGUIRRE collected the money but stated it was near a QuikTrip gas station located between 75th Avenue and 43rd Avenue and between Van Buren Street and Lower Buckeye Road in Phoenix, Arizona.

68. I.R. stated that he and AGUIRRE then traveled to a house known to your Affiant to be AISPURO's residence according to Arizona Motor Vehicle Division (AZ MVD) records.

69. I.R.'s statements place AGUIRRE and AISPURO together shortly after an ammunition-smuggling event and after AGUIRRE collected a substantial amount of currency. This statement is consistent with I.R.'s additional statement that AISPURO was pleased that the ammunition had reached Mexico and that AISPURO and AGUIRRE discussed obtaining a .50-caliber rifle for transport into Mexico.

70. On August 13, 2026, the U.S. Department of Commerce (DOC), Bureau of Industry and Security (BIS), Office of Exporter Services, completed a licensing-history check for Kevin AGUIRRE and I.R. BIS certified that no export-license history was found for either individual in the Commerce Department's electronic export-license-management record systems. BIS advised that its electronic record-system checks extend back to October 2012.

71. On October 15, 2026, DOC BIS completed a licensing-history check for AISPURO. BIS certified that no export-license history was found for AISPURO in the

Commerce Department's electronic export-license-management record systems. BIS advised that its electronic record-system checks extend back to October 2012.

**December 2025 Straw Purchase – AISPURO**

69. On December 3, 2025, ATF received information regarding the prepaid purchase and attempted transfer of a Barrett 416 caliber rifle. ATF Agents learned an individual entered Federal Firearms Licensee (FFL) Tombstone Tactical in Phoenix, Arizona, and attempted to pick up a firearm: one Barrett M82A1 rifle, with serial number AA019000, chambered in .416 caliber.

70. That day, an adult male, whose identity is known to your Affiant (identified herein as L.Z.) entered Tombstone Tactical to take possession of the prepaid Barrett rifle. Tombstone Tactical personnel reported that L.Z. did not initially know the firearm's model or caliber and stated that he had ordered a "fifty" online. When Tombstone Tactical personnel clarified that the rifle was chambered in .416 caliber, L.Z. stated that was what he meant.

71. Tombstone Tactical personnel reported that L.Z. was using his cell phone, speaking in Spanish, and sending text messages while responding to questions concerning the firearm. Tombstone Tactical personnel also reported that the telephone number and email address used for the online purchase differed from the contact information L.Z. used at the store. The fact L.Z. did not know the exact model and caliber of the firearm being picked up concerned the sales associate, who then notified ATF of the suspicious activity. The sales associate had L.Z. fill out the ATF Form 4473 (Firearm Transaction Record) and L.Z. received a delayed status.

72. ATF Special Agents reviewed a copy of the ATF Form 4473 corresponding to L.Z.'s attempted transfer of the firearm at Tombstone Tactical. In reviewing the form, Special Agents noted L.Z. identified his current state of residence and address as a location in Glendale, Arizona. L.Z. also answered "yes" to question 21a on the form which states, "Are you the actual transferee/buyer of all of the firearm(s) listed on this form and any

continuation sheet(s) (ATF Form 5300.9a)? Warning: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearms(s) to you." Lastly, L.Z. signed his name certifying the ATF Form 4473 in block 22.

73. On December 4, 2025, ATF Agents traveled to FFL Tombstone Tactical and took possession of the Barrett .416 caliber rifle prior to its transfer to L.Z. as it was suspected to be a straw purchase. FFL Tombstone Tactical was provided ATF Form 3400.23 Receipt of Property and 3400.1 Consent of Forfeiture, which Tombstone Tactical employees reviewed and signed.

74. On or about December 16, 2025, ATF SAs interviewed L.Z. L.Z. identified AISPURO as the person who recruited him to straw purchase firearms. L.Z. identified +1 602XXXXX07 as AISPURO's telephone number.

75. L.Z. stated AISPURO had asked him to purchase firearms for AISPURO because AISPURO was younger and did not have identification. L.Z. stated AISPURO provided money in advance for firearm purchases and paid L.Z. cash for his participation.

76. L.Z. stated he had previously purchased firearms for AISPURO on three or four occasions. L.Z. stated that he had purchased an AR-style rifle and a Glock pistol for AISPURO from Ammo AZ. L.Z. stated that AISPURO ordered the Barrett rifle and provided money for L.Z. to acquire it. Your Affiant recognizes that the firearms AISPURO asked L.Z. to straw purchase are commonly encountered in firearms-trafficking activity. Your Affiant knows, based on training and experience, that AR-style rifles, Glock handguns, and Barrett rifles are highly sought after by Mexican cartels.

77. Agents asked how much L.Z. received for buying the Barrett. L.Z. said nothing yet because L.Z. didn't have it yet. L.Z. did confirm he would get paid after AISPURO received the firearm. Agents asked L.Z. to explain why there was confusion at Tombstone Tactical when L.Z. picked up the firearm. L.Z. said AISPURO ordered it online over email and he thought he was picking up a .50 caliber, not a .416.

78. Agents asked if L.Z. was willing to show his phone to verify the conversation between L.Z. and AISPURO about the firearms. L.Z. stated he did not have his phone with him during the interview. L.Z. said he was willing to screen-shot the conversation and send it to Agents after the interview.

79. Agents explained to L.Z. he would not be receiving the firearm back as this was a straw purchase. L.Z. was provided with a Warning Notice of Straw Purchasing. Agents explained the form to L.Z. After reviewing the form, L.Z. signed it along with the ATF Form 3400.1 Consent to Forfeiture or Destruction of Property and Waiver of Notice for the Barrett .416 rifle.

80. In March of 2026, ATF Agents were able to review the cell conversations between L.Z. and AISPURO referencing the straw purchase of the .416 Barrett rifle from Tombstone Tactical. It should be noted the messages were obtained from L.Z. after his interviews with ATF Agents on December 15, 2026. The text messages between L.Z. and AISPURO occurred on December 3, 2026, which is the same day L.Z. attempted to acquire the Barrett .416 rifle from Tombstone Tactical.

81. During the text exchanges, AISPURO asked when L.Z. was "headed over there."[2] L.Z. replied that he was with a girl and was close to the toy store.[3] L.Z. then asked AISPURO if he was going to do that,[4] and AISPURO affirmed. L.Z. clarified if it was just a matter of completing the paperwork. AISPURO then proceeded to provide L.Z. photographs of the order pick-up confirmation and the order confirmation. AISPURO explained they were photographs of the receipts in case L.Z. happened to need them.

---

[2] In context, your Affiant believes this is referring to Tombstone Tactical.

[3] Your Affiant knows "toy store" is a common term used to refer to a gun store.

[4] Your Affiant believes "do that" is, in context, a reference to straw purchasing the firearm.

82. AISPURO then instructed L.Z. to make sure he never stated that he was going to sell the firearm and instead claim it was a gift. L.Z. then asked AISPURO if the firearm was a "416" or "50". AISPURO answered it was "416." L.Z. stated he was asking because L.Z. was not sure what AISPURO ordered and L.Z. just wanted to show up and tell them. The following is a screenshot of the receipt AISPURO sent to L.Z.:

///

///

///

///

///

///

///

///

# Great news! Your order 100253042 is ready for pickup!

## YOUR ORDER IS READY FOR PICKUP

Hi there,

Great news — your Tombstone Tactical order is locked, loaded, and ready for pickup.

**ORDER NUMBER:** 100253042

View Your Order #100253042

**PICKUP DURING OUR STORE HOURS:**

**Monday – Friday:** 9:00 AM – 7:00 PM
**Saturday:** 9:00 AM – 6:00 PM
**Sunday:** 10:00 AM – 5:00 PM

When you arrive, please bring a valid ID and any required documentation for your purchase.

Thank you for choosing **Tombstone Tactical** — where **great gear meets great service.**

We appreciate your business and can't wait to see you.

CHECK OUT OUR SALE ITEMS

If you have any questions about your order or pickup, our support team is here to help.

Email: sales@tombstonetactical.com | Phone: 480-588-0878

Phoenix: 10011 N Metro Pkwy E · Phoenix, AZ 85051 · 480-588-0878
Chino Valley: 437 Butterfield Rd · Chino Valley, AZ 86323 · 928-237-4461

© 2025 Tombstone Tactical. All Rights Reserved.

sales@tombstonetactical.com
seperately.

## ORDER #: 100253042

Billing Address:
[redacted]

Shipping Address:
[redacted]

FFL Recipient ID:

FFL Recipient:
, ,

FFL Contact:

Total Items:
1

Cart Total:
7,912.14

Tax:
720.00

Shipping Fee:
0.00

Handling Charge:
Handling Charge: 0.00

Donation:
0.00

Order Total:
8,632.14

| Product Code | UPC | Description | Quantity | Price | Extended |
|---|---|---|---|---|---|

8167 Barrett 13315 M82A1 Semi-Automatic .416
491644 15011 Barrett 29in 10rd Black Rifle, Enhanced

83. AISPURO then sent L.Z. a voice note stating that L.Z. was going to arrive and tell them that his online order had arrived. AISPURO stated that L.Z. could pull out the receipt which contained all the information on it. AISPURO stated L.Z. should say that he was there to fill out the paperwork. AISPURO then sent L.Z. another text message reminding him that the caliber was 416.

84. Based on your Affiant's training and experience and consultation with other experienced firearms trafficking investigators, numerous past and current ATF investigations have shown that straw purchasers are routinely recruited to purchase firearms in the State of Arizona in the same manner AISPURO and L.Z. perpetrated in order to obtain the Barrett .416 rifle. These types of straw purchasing activities within Arizona are highly prevalent in the trafficking of firearms to criminal cartels within Mexico. Barrett .416 rifles are sought after by these criminal organizations in order as a form of power and prestige as they are used in violent conflicts throughout Mexico.

85. Additionally, AISPURO's attempted acquisition of the Barrett M82A1 rifle provides relevant context to I.R.'s account of AGUIRRE and AISPURO discussing the acquisition of a high-caliber rifle for transport into Mexico.

**March 18, 2026, Ammunition Transfer**

72. On March 18, 2026, HSI SAs conducted surveillance on AISPURO while he drove his white Mercedes-Benz C-300, a vehicle known to your Affiant through public records and surveillance to be associated with AISPURO.

73. AISPURO then drove the Mercedes-Benz to an address in Tolleson, Arizona, which is known to your Affiant to be AGUIRRE's residence.

74. A male entered the front passenger seat of the Mercedes-Benz at AGUIRRE's residence. HSI SAs later identified the passenger as AGUIRRE by comparing the individual with AGUIRRE's AZ MVD photograph.

75. AISPURO and AGUIRRE then traveled in the Mercedes-Benz to a QuikTrip gas station near an Arby's restaurant in Avondale, Arizona, where they met another adult male, whose identity is known to your Affiant and who is identified herein as C.G.

76. C.G. was operating a Dodge Ram pickup truck with a camper shell. HSI SA Zuniga observed what appeared to be more than 15 large ammunition boxes in the bed of C.G.'s truck.

77. AISPURO, AGUIRRE, and C.G. moved their vehicles to the rear of the Arby's parking lot. HSI SAs observed AISPURO transfer boxes that appeared to be consistent with boxes of ammunition from C.G.'s truck into the trunk of the Mercedes-Benz.

78. AGUIRRE and C.G. spoke near the vehicles while AISPURO transferred the suspected boxes of ammunition. AISPURO later removed boxes from the Mercedes-Benz and returned them to C.G.'s truck. Investigators were not able to see if all of the boxes were removed or if some of the boxes remained in the vehicle.

79. Your Affiant recognized this activity as consistent with an effort to determine how low the vehicle would ride when carrying a significant amount of weight in its rear. Based on your Affiant's training and experience, including interviews of smugglers and analyses of telephone communications, smugglers are often concerned that a vehicle riding unusually low may draw the attention of law enforcement, particularly highway interdiction units operating near the U.S.-Mexico border.

80. Photographs from the March 18, 2026, event are included below:

///

///



81.



82.

83. 

84. 

85. 

**San Luis, Arizona Residential Search Warrant**

86. On May 7, 2026, HSI Phoenix, HSI Yuma, U.S. Border Patrol (USBP), and U.S. Customs and Border Protection (CBP) personnel executed a federal search warrant at a residence in San Luis, Arizona. Previous surveillance on April 30, 2026, had observed AISPURO driving his vehicle to this residence.

87. During the search, agents seized two handguns; approximately 55,000 rounds of 5.56-millimeter ammunition; additional 9-millimeter and .45-caliber ammunition; firearm magazines; optics; firearm parts; approximately $2,400 in U.S. currency; cellular telephones; 51 Subscriber Identity Module (SIM) cards; documents; and an empty Barrett .50-caliber rifle case and owner's manual.

88. Agents subsequently searched a storage unit associated with the San Luis residence and seized approximately 26,978 rounds of 5.56-millimeter ammunition and

approximately 24,546 rounds of 7.62x39-millimeter ammunition. Your Affiant knows, based on training and experience, that 5.56-millimeter and 7.62x39-millimeter ammunition is a caliber that is intended for use in AK-style rifles and is highly sought-after by Mexican cartels. Photographs from the search warrant execution are included below:

89. 

90. 

91. 


**Interview of J.R.**

92. On October 13, 2026, HSI, ATF, and U.S. Immigration and Customs Enforcement and Removal Operations officers encountered J.R., an adult male whose identity is known to your Affiant, and who is an illegal alien, in Phoenix, Arizona. Following his administrative arrest, J.R. was transported to the Drug Enforcement Administration (DEA) Phoenix Office.

93. Your Affiant, HSI SA David Carlson, and ATF SA Trevor Page interviewed J.R. SA Carlson translated between English and Spanish. The interview was conducted in Spanish and audio-recorded. J.R. was not made any promises in relation to his interview.

94. SA Carlson advised J.R. of his *Miranda* rights in Spanish. J.R. stated he understood his rights and signed a written waiver indicating he was willing to answer questions.

95. J.R. stated that a person known to him as "Kevin" purchased firearms and ammunition and sent them to Mexico. Your Affiant showed J.R. a photograph of AGUIRRE. J.R. identified AGUIRRE as the individual he knew as "Kevin."

96. J.R. stated AGUIRRE recruited younger individuals, all over 18 years old, to purchase firearms from stores in the Phoenix area. J.R. stated AGUIRRE paid those individuals approximately $500 to purchase firearms.

97. J.R. stated AGUIRRE sometimes used the same individuals to purchase and transport firearms into Mexico. J.R. stated that AGUIRRE was known to move a large quantity of firearms.

98. J.R. stated that, approximately six months before the October 13, 2026, interview, he accompanied AGUIRRE to a friend's residence and observed approximately 30 to 40 firearms there.

99. J.R. described the firearms as including large-caliber weapons, AK-47-style firearms, and Barrett .50-caliber rifles. J.R. stated the residence was near 67th Avenue and McDowell Road in Phoenix, Arizona,[5] and provided a known first name for AGUIRRE's friend, who owned a jewelry store.

100. Your Affiant identified AGUIRRE's friend based on previous review of AGUIRRE's telephone toll records. This individual's name is known to your Affiant and is an adult male, hereinafter identified as Co-Conspirator 1.

---

[5] This location described by J.R. is in the same area described by I.R. in paragraph 67, above, and is believed by your Affiant to be the same residence where I.R. and AGUIRRE collected $10,000.

101. Your Affiant reviewed mapping information and determined that Co-Conspirator 1's registered address through AZ MVD is near 67th Avenue and McDowell Road in Phoenix, Arizona.

102. Your Affiant showed J.R. a Google image of Co-Conspirator 1's registered address. J.R. identified that residence as the location where he observed the firearms.

103. J.R. also positively identified Co-Conspirator 1 via photograph as the person AGUIRRE met at Co-Conspirator 1's registered address.

104. J.R. stated Co-Conspirator 1 recruited individuals to conduct straw purchases for AGUIRRE and stored AGUIRRE's firearms at Co-Conspirator 1's registered address. J.R. also stated AGUIRRE recruited firearms-trafficking associates at parties.

105. J.R. stated AGUIRRE drove a gray Dodge Challenger Hellcat and a Jeep.

106. J.R. consented to a search of his cellular telephone and provided the passcode. During an initial manual review, investigators did not identify evidence showing that J.R. personally participated in firearms trafficking.

107. J.R. independently identified AGUIRRE as "Kevin," described AGUIRRE as recruiting persons to acquire firearms from retail stores, and stated that AGUIRRE used individuals to purchase and transport firearms into Mexico. J.R.'s identification of AGUIRRE as "Kevin" and his description of firearms-acquisition activity are consistent with I.R.'s identification of AGUIRRE as "Kevin" and "Richy Rich," the social-media communications associated with AGUIRRE, and the March 18, 2026, surveillance of AGUIRRE with AISPURO during activity involving apparent ammunition boxes. J.R.'s statement that AGUIRRE recruited associates at parties is also consistent with I.R.'s statement that AGUIRRE recruited him at a party.

**<u>AISPURO's Apple iCloud and the Barrett Rifle</u>**

108. On June 4, 2026, ATF obtained a federal search warrant for Apple iCloud accounts associated with AISPURO and telephone number +1 602XXXXX07.

109. On October 14, 2026, ATF SA Trevor Page reviewed the resulting iCloud extraction.

110. During the review, SA Page identified an image of a Barrett Model 82A1 rifle bearing serial number AA018933 within AISPURO's iCloud data. The image metadata reflected a last-modified date of May 19, 2025. ATF trace information showed that Barrett Model 82A1 rifle, serial number AA018933, was purchased by an adult male, whose name is known to your Affiant and identified herein as H.M., from S2 Armament, a Federal Firearms Licensee (FFL) in Glendale, Arizona, on May 18, 2025. The image is shown below:

111. 


112. The ATF trace further showed that Mexican authorities recovered the Barrett Model 82A1 rifle, serial number AA018933, in Pueblo Nuevo, Durango, Mexico, on April 18, 2026.

113. SA Page reviewed AISPURO's iCloud search warrant results and found that the photo of the Barrett rifle was time stamped May 19, 2025. The following is a highlighted screenshot of the time stamp:

**MATCHING RESULTS** (3 of 67,771)

Column view

| Artifact | Key detail | Sup... | Additi... | Date and time | Item ID |
|---|---|---|---|---|---|
| Custom<br>File Signature Mismatch (Picture) | File Name<br>F_766AE444-7858-43C8-A2EB-48927ED6FF2A_8p9... | | File Type<br>image/jpeg | | 19904 |
| Media<br>Pictures | File Name<br>F_766AE444-7858-43C8-A2EB-48927ED6FF2A_8p9... | Size (Bytes)<br>2,315,084 | | Created Date/Time<br>6/17/2026 7:47:04.952 PM | 20068 |
| Media<br>Pictures | File Name<br>afb7ccd7-4100-402f-b422-4fe03843d047.jpg | Size (Bytes)<br>2,315,084 | File Extension<br>.jpg | Last Modified Date/Time<br>5/19/2025 5:37:06.000 PM | 66111 |

114. Thus, AISPURO had a picture of the Barrett rifle (that H.M. purchased) in his cell phone one day after H.M. purchased the Model 82A1 rifle, serial number AA018933 from S2 Armament.

115. On October 14, 2026, SA Trevor Page contacted FFL S2 Armament about the Barrett, .50 caliber rifle, S/N AA018933 purchased by H.M. on May 18, 2025. SA Page was able to speak with an S2 Armament employee, who stated he knew H.M. and was the one who sold H.M. the firearm. ATF SA Page requested and received the ATF Form 4473 for the Barrett purchased by H.M. A review of the ATF form 4473 revealed that H.M. indicated that he was the actual purchaser of the firearm.

**<u>Straw Purchase on May 18, 2025 – AGUIRRE</u>**

116. On October 14, 2026, SA Page contacted H.M. by telephone about a Barrett, .50 caliber rifle, S/N AA018933, purchased at S2 Armament.

117. H.M. stated that he had purchased the Barrett rifle from S2 Armament. He stated he owned it for about 10 or 11 months before selling it to someone he had met through the car scene.

118. SA Page asked H.M. who he sold the firearm to. H.M. stated that he was contacted through Instagram by the individual, and he could provide a screenshot of the user account. The provided screenshot identified "Impexotics," one of AGUIRRE's known Instagram usernames, as the individual who contacted H.M.

119. SA Page asked H.M. if he could identify the firearm purchaser from a photo. H.M. stated he would absolutely be able to identify the purchaser. SA Page sent a photo of AGUIRRE to H.M., and H.M. positively identified AGUIRRE as the purchaser of the firearm.

120. On October 15, 2026, your Affiant, along with ATF SA Trevor Page, conducted an audio-recorded telephonic interview of H.M. regarding Barrett Model 82A1 rifle, serial number AA018933. This was the second interview with H.M. in relation to this matter.

121. H.M. confirmed that he purchased the rifle from S2 Armament in Glendale, Arizona, and stated that he paid approximately $10,500 in cash for the rifle.

122. H.M. stated that he initially met an individual he knew as "Alex" while working security at a party in the Avondale or Goodyear, Arizona, area. During the interview, investigators showed H.M. a photograph of AGUIRRE. H.M. identified AGUIRRE as the individual he knew as "Alex" and stated that he was "one thousand percent" certain that AGUIRRE was the person who acquired the Barrett rifle from him.

123. H.M. stated that AGUIRRE repeatedly asked him whether he knew persons with firearms for sale, including a .50-caliber rifle and a SAW-type firearm. H.M. stated that AGUIRRE later asked H.M. to purchase a Barrett .50-caliber rifle for him. H.M. stated that he initially expressed concern about purchasing a firearm for another person, but AGUIRRE continued asking him to acquire the rifle and offered H.M. approximately $2,000 in additional compensation. H.M. stated that, because he was experiencing financial difficulties, he agreed to purchase the Barrett rifle for AGUIRRE.

124. H.M. stated that AGUIRRE met him near an EOS Fitness location and provided cash in an envelope for the purchase of the Barrett rifle. H.M. stated that

AGUIRRE arrived alone in a Jeep Gladiator. Throughout this investigation, investigators have observed AGUIRRE operating a Jeep Gladiator bearing Arizona license plate 79A6SB, which is registered to 8709 West Washington Street, Tolleson, Arizona, a residence associated with AGUIRRE. H.M. stated that he used the cash AGUIRRE provided to purchase the Barrett rifle from S2 Armament.

125. H.M. stated that, after purchasing the Barrett rifle, he sent AGUIRRE a photograph of it. H.M. stated that AGUIRRE took possession of the rifle a few days later. H.M. stated that AGUIRRE was accompanied by another male during the transfer. Investigators showed H.M. a photograph of AISPURO, and H.M. identified AISPURO as the male who accompanied AGUIRRE during the firearm transfer. H.M. stated that he was approximately 97 percent certain of the identification.

126. H.M. identified the Instagram account through which he communicated with AGUIRRE as "_Impexotics." Information provided by Meta independently identified the "_Impexotics" Instagram account as associated with AGUIRRE, and the account was also identified in the February 4, 2026, HSTF NCC lead regarding AGUIRRE. H.M. acknowledged that he purchased the Barrett rifle using money provided by AGUIRRE and subsequently transferred the rifle to AGUIRRE. H.M. stated that he initially provided investigators with an incomplete account because he was concerned about possible legal consequences.

127. H.M. stated that AGUIRRE told him the Barrett rifle was for personal use and did not tell H.M. that the rifle would be transported to Mexico or otherwise used in criminal activity. Nevertheless, the information provided by H.M. establishes that AGUIRRE financed H.M.'s purchase of the Barrett rifle, arranged for H.M. to acquire the rifle, and took possession of the rifle shortly after its purchase. H.M. further identified AISPURO as present with AGUIRRE when AGUIRRE took possession of the rifle. This information is consistent with the image of the same Barrett rifle recovered from AISPURO's iCloud data and the subsequent recovery of the rifle in Pueblo Nuevo, Durango, Mexico, on April 18, 2026.

## Wage Information

69. Your Affiant reviewed Arizona Department of Economic Security (DES) wage information for AGUIRRE and AISPURO. The records reflect limited Arizona wage reporting during the periods returned by the respective queries.

70. In the first quarter of 2024, DES reported AGUIRRE earned $1,854.57. As of the February 24, 2026 query, no wages had since been reported by DES.

71. As of June 30, 2024, DES reported AISPURO earned $5,782.80. As of the March 9, 2026 query, no wages had since been reported by DES.

72. The records did not reflect wage information sufficient to explain, by themselves, the substantial cash firearm and ammunition transactions described in this affidavit. Your Affiant recognizes, based on training and experience, that persons engaged in firearms-trafficking activity may use cash transactions and store proceeds, currency, transaction records, electronic devices, and other evidence at residences and locations they control.

## CONCLUSION

128. Based on the foregoing, there is probable cause to conclude that the defendants, Kevin AGUIRRE and Anthony AISPURO-RIOS, violated Title 18, United States Code, Section 554(a), Smuggling Goods from the United States, and Title 18, United States Code, Sections 922(a)(6), 924(a)(2), and 2, Aiding and Abetting Straw Purchasing.

Respectfully submitted,

MICHAEL J HONADLE
Digitally signed by MICHAEL J HONADLE
Date: 2026.10.26 12:35:11 -07'00'

Michael Honadle
Special Agent, HSI

Subscribed and sworn to me telephonically this 26th day of October, 2026.

HONORABLE M. BRIDGET MINDER
United States Magistrate Judge